The **FIRESTONE TIRE & RUBBER COMPANY**

v.

The **GENERAL TIRE & RUBBER COMPANY.**

Civ. A. No. 12932.

United States District Court
D. Maryland.

Oct. 17, 1966.

Edward S. Irons, Washington, D. C., Benjamin C. Howard, Baltimore, Md., Stanley M. Clark, Akron, Ohio, for plaintiff.

Charles J. Merriam, Chicago, Ill., Norman P. Ramsey, Baltimore, Md., Frank J. Earnheart, Akron, Ohio, for defendant.

MEMORANDUM ON DEFENDANT'S RENEWED MOTIONS TO TRANSFER AND TO IMPOSE SANCTIONS.

R. DORSEY WATKINS, District Judge.

The defendant, The General Tire & Rubber Company (General), has renewed

its motion of April 13, 1961 to dismiss or transfer, and its motion of September 6, 1963, to transfer, this case to the United States District Court for the Northern District of Ohio, Eastern Division. Defendant further moves that sanctions be imposed upon plaintiffs,[1] including General's attorney fees and expenses arising from the prosecution of Civil Action No. 12,932, and an equal amount "against plaintiffs payable to the Court to compensate for plaintiffs' gross imposition upon the Court and hardship caused other litigants by plaintiffs' fraudulent monopolizing of over two and one-quarter years of the Court's time * * * [and] for such other penalties, sanctions, and relief as the Court may see fit."

The Court is also requested to enter certain proposed Findings of Fact.

The motions are stated to be based, "in addition to the grounds set forth in the documents supporting the previous transfer motions, upon newly discovered evidence which was kept from defendant by plaintiffs, although it was in the possession and control of one or both plaintiffs and known by them prior to the transfer motions of April 13, 1961 and September 6, 1963. The motions are also brought following the suggestions of the Court of Appeals in Case No. 10,429, at pages seven and eight of its opinion. [General Tire & Rubber Company v. Watkins, 4 Cir. 1966, 363 F.2d 87, 89–90]."

Significantly, there is no renewal of, or even mention of, defendant's motion of October 12, 1965, seeking, among other things, a dismissal of the declaratory judgment action of McCreary Tire & Rubber Company (McCreary), a dismissal of the declaratory judgment action of The Firestone Tire & Rubber Company (Firestone), or in the alternative, a dismissal of the non-infringement portion of the declaratory judgment action; and to charge Firestone and McCreary "with costs, expenses and attor-

ney fees resulting from their improper declaratory judgment action and conduct", and such additional relief as the Court may consider proper.

No mention is made of the Supplemental Statement filed by defendant on October 26, 1965, in support of the motion filed October 12, 1965. This Supplement is primarily related to meetings in March 1961, purportedly involving the relationship of Goodyear Tire and Rubber Company and United States Tire and Rubber Company to this litigation.

Finally, no mention is made of this Court's ruling on December 13, 1965, denying the motion of October 12, 1965 as supplemented on October 26, 1965, raising substantially the same contentions as are made herein, nor of the Court's oral opinion thereon (Transcript, pages 26,987–27,010).

In General Tire and Rubber Company v. Watkins, supra, the Court of Appeals said (363 F.2d at pages 89–90):

"Since the oral argument McCreary and General Tire have filed certain papers in this court in an effort to amplify the record. They are bottomed upon what purports to be a tape recording of a telephone conversation between a former president of McCreary and one of the lawyers for Firestone. It is suggested that there was falsity in the plaintiffs' representations—in opposition to General's original motion to transfer the case to Ohio—that McCreary was an independent party prosecuting the case at its own expense. These representations may well have been the determinative factor in the denial of the transfer motion. If they were in fact untrue, it appears that the plaintiffs may have practiced a serious fraud upon the District Court.

"However, these papers are not germane to the present petition for mandamus to disqualify the District Judge, and the propriety of the earlier motion to transfer is not now before us.

---

1. Plaintiff McCreary and defendant General have reached a settlement and the Amended Complaint of McCreary has been dismissed with prejudice.

If the tape recording constitutes newly discovered evidence warranting reconsideration of the motion to transfer or any other relief, or the imposition of any sanction, it should first be presented to the District Court, with a motion stating what relief is claimed. After a hearing, the District Court will be in position to determine the authenticity of the tape recording, the truth and materiality of any representations made to the court earlier, and to grant whatever relief may be appropriate.

"After the District Court has acted upon an amplified record, this court can entertain any issue appropriately brought up for review. Until then, any application based upon the tape recording or a claim of earlier misrepresentation should be addressed to the District Court."

Neither side has asked to take further testimony, or otherwise to amplify the record. However, oral argument was had on September 19, 1966, and on September 26, 1966, the Court advised counsel that the motion had been denied—this memorandum states the reasons therefor.

In its Memorandum in support of the present Motions defendant says (pages 1–2):

"Pursuant to this clear invitation of the Court of Appeals, defendant has renewed its April 13, 1961 motion to dismiss or transfer and its September 6, 1963 renewed motion to transfer. The foundation for the present renewed motion is the *newly discovered evidence* comprising DX 1840, the 'backfire' memorandum, and the dictaphone recording of the May 9, 1961 telephone conversation between Mr. Birch and Mr. Harry C. McCreary, Sr. R. 33,325–33,330." (Emphasis supplied.)

DX 1840 was filed September 30, 1965, well before this Court's opinion of December 13, 1965, denying defendant's

motion to dismiss as supplemented (which raised issues presently before the Court) so that the only "newly discovered evidence" is the dictaphone recording, certain papers in McCreary's files (McCreary Exhibits 1–7), and the testimony with respect thereto. This Court might well confine its consideration to the significance, if any, of this newly discovered evidence on the claim of fraud. Since, however, the charge is so serious, and defendant attacks the professional integrity of Firestone's attorneys, including the credibility of Firestone's house counsel, who is also an attorney, although not engaged in court appearances, the Court will consider all of the grounds advanced by defendant in defendant's Memorandum and proposed Findings of Fact.

### 1. *The Origin of this Litigation.*

Defendant contends that Firestone brought this action at the invitation of Goodyear and U. S. Rubber to delay and disrupt the Ohio litigation. Reference is made to a claimed "backfire" suggestion of Mr. Kenyon; the significance of DX 1840; and the claim is made that the dictaphone recording showed that some secret agreement existed between Firestone and McCreary. The same contentions, including the one that there was an undisclosed agreement between Firestone and McCreary (but not, of course, relying upon the dictaphone belt), were made by defendant in its Memorandum in support of its October 12, 1965 motions; together with an attack upon the "chameleon testimony" of Clark, Firestone's house patent counsel.[2]

These contentions, except as to the significance of the dictaphone belt, were in effect found to be lacking in merit by this Court's ruling and oral opinion of December 13, 1963 (Transcript, pages 26,987–27,010, and especially 26,991, where there is a reference to the "backfire"; and 26,991–26,993 where the New York conferences are mentioned).

2. This attack is repeated in defendant's Response to Plaintiff's Proposed Findings in opposition to defendant's Motions to dismiss or transfer, to transfer and for the imposition of sanctions.

■ However, that there may be no doubt, the Court, after a consideration of the record, and particularly the testimony of Mr. Clark, both by way of deposition and in open court; DX 1840; and the exhibits to defendant's Supplemental Statement, filed October 26, 1965, finds that the substance of the New York conference on March 17, 1961 is as stated by Clark in Transcript, pages 22,230–22,244; that the conference was initiated by Clark to consider trial tactics by Firestone, including the place where a declaratory judgment suit should be filed and the possible effects of an earlier decision in either the Cleveland, Ohio, litigation or where Firestone might sue; that the instant litigation was not at the suggestion or request of United States Tire and Rubber Company and/or Goodyear Tire and Rubber Company, but was a bona fide and independent effort on the part of Firestone to secure an adjudication in a circuit other than the Sixth Circuit; that the joinder of McCreary was a last minute idea, stimulated by the inclusion in the draft complaint of a reference to an alleged world-wide license; and that no fraud was attempted or perpetrated upon the Court as to the origin of the litigation.

This finding is made because the Court is satisfied that the witness Clark testified honestly in his deposition and in court. The Court has also taken into consideration his general demeanor on the stand and that the discrepancies, if any, were insubstantial; and that his inabilities to recall were because of, and consistent with, the passage of time and the absence of memoranda kept by him.[3]

These conclusions are fortified, as to the March 17, 1961 meeting, by the Answers to Interrogatories, filed by defendant on October 26, 1965, with respect to Messrs. Kenyon and Mandelbaum, attorneys for United States Rubber Company and Mr. J. A. Fowler, Jr., attorney for Goodyear Tire and Rubber Company. Messrs. Kenyon and Mandelbaum are reported as stating, with regard to Transcript, pages 22,230–22,244, that "So far as concerns their recollection of the events that occurred at the meeting of March 17, 1961, their recollection is in general[4] in accord with the aforesaid testimony." As to Mr. Fowler, reference is made to Mr. Clark's testimony on September 30, 1965, and it is stated: "Mr. Clark in his answers stated his recollection or speculation, and Mr. Fowler is not in a position to disagree with such answers."

2. *The "Agreement" between Firestone and McCreary.*

The question of agreement between Firestone and McCreary as to McCreary's responsibility seems to have been considered under four topics or aspects—(a) indemnity or hold harmless; (b) dependence or independence; (c) liability for expenses; and (d) "secret." These will be considered in the same order.

(a) Indemnification or hold harmless.

All the testimony, and the answers to an appropriate interrogatory are to the effect that there never was any agreement by Firestone to hold McCreary harmless, or to indemnify it, with respect to this litigation. Except as it may be implicit in the claimed "secret" agree-

---

3. In reaching these conclusions the Court has considered McCreary exhibits one through seven submitted by Mr. Walter J. Blenko, Jr., at the time of the hearing of April 26, 1966 in this court and has found the discrepancies, if any, between Clark's testimony and Mr. McCreary, Sr.'s memoranda relating to their communications prior to the filing of the instant suit insubstantial and of no materiality on the issues involved in the current motions.

4. Defendant apparently argues that because Messrs. Kenyon and Mandelbaum agreed "in general" they should have stated any particulars in which they did not agree. The Court construes the statement attributed to them to mean that while they might have used language different from Clark's, in substance they agreed with him. Clearly their language does not permit of a construction that they disagreed on any material aspect or statement.

ment,[5] there is no serious contention that any such indemnification or hold harmless agreement existed.

The Court finds as a fact that there was no such agreement.

(b) Dependence or independence of McCreary.

The testimony and exhibits have consistently shown that McCreary had some sort of responsibility with respect to the cost, including attorneys' fees, of this litigation. In that respect only, may McCreary be said not to have been completely independent of Firestone, in that Firestone was to bear the bulk of the expenses.

Other than financial, the record on relationship is as follows:

(i) On July 6, 1961, at the hearing on the first transfer motion, Mr. Irons spoke of Mr. McCreary (in the latter's presence) as follows:

"He [McCreary] comes here jointly as plaintiff with Firestone, but other than that, independent, he pays my bills as I send them to him, * * * he can accept a judgment against him or he can take such other action as he wants to, he is subject to no mandate or direction from Firestone." (Page 62.)

\* \* \* \* \* \*

"He [McCreary] can, perhaps, derive some benefit from his association with Firestone, but he comes here independently, and not as Firestone's agent or cat's paw, and I think that should be clearly understood." (Page 63.)

(ii). In his affidavit filed June 30, 1961, in opposition to the transfer motion, Mr. Irons referred several times to McCreary's independence.

(iii). In plaintiffs' Reply Memorandum filed before the pretrial hearing of July 6, 1961, it is stated (pages 17–18):

"Nor are there any aspects of 'McCreary's customer-supplier relationship with Firestone' which require proofs located in Akron. McCreary simply purchases unpatented oil-extended rubber from Firestone in routine manner. Such purchases are completed in Indiana, Pennsylvania. Other than conventional purchase orders, there are no oral or written contracts whatever between Firestone and McCreary.[19]

"19. Hence the testimony of 'persons having knowledge of Firestone's relationships with its customer McCreary' (Def. Br. page 17) is not material."

Defendant quotes only the last sentence of the text, without reference to the footnote, or to its omission, and argues that this is inconsistent with an agreement to pay part of the expenses of litigation.

The Court finds that in context, the reference was as to the absence of any reason to transfer to Ohio, for the convenience of securing evidence as to the work-a-day customer relationship between Firestone and McCreary. The Court would not and does not construe the whole, or the quoted part, of the paragraph, as a representation to the Court that there was no arrangement as to the sharing of the litigation expenses.

(iv). Defendant refers to McCreary's answers to Interrogatories 11 and 12, filed on October 16, 1961, and read into the record on April 28, 1965, at Transcript, pages 18,372–18,374. Interrogatory 11 asked for identity of all written agreements between Firestone and McCreary which relate to participation in this case, to which the answer was that there are none. Interrogatory 12 asked if there were any oral agree-

---

5. Since the terms of a "secret" agreement are necessarily not known except to the alleged parties, arguably the agreement could be all-embracive, or limited to a single point. Defendant has not sought to enlighten the court as to what the terms of the supposed secret agreement are.

ments on the same subject matter. The answer was not a simple "No", but:

"There are no oral agreements between the Firestone Tire and Rubber Company and plaintiff McCreary which relate to the participation of plaintiff McCreary and the Firestone Tire and Rubber Company *in the conduct of* this civil action." (Emphasis supplied.)

The contrast in the direct denial in response to Interrogatory 11, and the qualified answer to Interrogatory 12 is significant. "Participation in this case" might well mean participation in any manner, including sharing or contribution in expenses or costs. "Participation * * * in the conduct of" the case would normally mean participation in control of the course of the litigation, including trial tactics, selection of experts, raising of issues, selection of defenses, decisions as to admissions, and decisions as to whether or not settlement should be discussed, and if a settlement were to be effected, when and for how much. An agreement to pay a part of the cost of litigation would be consistent with the absence of any agreement as to participation in or right to participate in the conduct of the case.

(v). The deposition of Clark (Transcript, pages 18,933–18,934) and the testimony of Birch (Transcript, pages 22,668–22,669) as to charges to McCreary are completely consistent with the only arrangement between Firestone and McCreary being the sharing of costs, as is the dictaphone recording, to be discussed in more detail.

(vi). What has actually occurred in this case is a pragmatic demonstration of McCreary's "independence", other than its obligation to pay a share of the expenses. McCreary did, without so far as the record shows any prior consultation with or approval by Firestone, employ new attorneys and discharge its old, enter into negotiations for settlement with General, and finally effect a settlement which left the entire controversy open between Firestone and General. General counters by saying that acts in 1966 do not prove independence in 1961. "The fact that the United States declared independence from Great Britain in 1776 does not mean that it was independent in 1771." [6] But there is nothing in the record to show that McCreary ever indicated that it was dependent upon Firestone, or had to, or did, declare its "independence."

McCreary's conduct in 1966, while it does not prove, is at the very least entirely consistent with, independence of Firestone in the conduct of this litigation, in and since 1961—and the Court finds this to be the fact, except as to McCreary's obligation to pay a share of the litigation expenses.

(c) McCreary's undertaking to pay a share of the litigation expenses.

It has, at least since July 6, 1961, been clear to this Court that some agreement or arrangement existed between Firestone and McCreary pursuant to which McCreary was to bear some portion of the litigation expenses, having relationship to the volume of production of the two companies. The order in which this developed (which is not the chronological order of the events themselves) is as follows:

(i) The statement by Mr. Irons at the July 6, 1961 hearing on the first transfer motion, quoted above, that McCreary "pays my bills as I send them to him * * *."

(ii) In his deposition taken on August 15, 1962 and read in part into the record on May 5, 1965, at pages 18,933–18,934, Mr. Clark testified:

"MR. MERRIAM: Would you turn to page 226, please, line 18:

" 'Q Does Firestone have any arrangement with McCreary as to payment of the cost of deposition transcripts, documentary production or any other expert witnesses, or any of these items which are incurred in connection with the instant litigation?

---

6. Defendant's Supplemental Section A, filed September 13, 1966.

" 'You are asking me the same question in different words. There is no—I have told you three or four times now that there is no arrangement between Firestone and McCreary.

" 'As to payment—

" 'As to any payment.'

"MR. MERRIAM: Now, will you go ahead with the continued answer?

" 'A Let me put it on the record. It has been a general understanding that the bulk of the expenses [18,934] of this litigation are to be paid by Firestone in view of Firestone's greater stake in the matter. The division of the costs were not a subject of agreement with McCreary beyond that general understanding, and the actual billings to McCreary have been left to Mr. Irons and Mr. McCreary and, as I stated yesterday, I deduce from the size of the bills that we are carrying the greater burden of this litigation, which I think is as it should be in view of the proportionate sizes of the two plaintiffs.' " [7]

(iii) On September 3, 1965, Mr. Clark testified as to a conversation with McCreary the day this suit was filed, in which McCreary was told that Firestone would bear the "bulk of the expenses." At that time the Court stated its recollection of the portion of the Clark deposition read into the record, to the effect that Firestone was bearing the larger portion of the expenses, but that Mr. Clark had made no agreement as to specific amounts or proportions. (Transcript, pages 22,266–22,270.)

(iv) On September 28, 1965, Mr. Birch was examined in open court by counsel for defendant. He testified that he had not read the McCreary deposition or Clark's testimony from the stand, and that some years ago he glanced briefly at the Clark deposition for a matter of a few minutes. He was asked specifically as to a fee bill of April 30, 1961 of the Irons firm to McCreary, he stated:

"First, let me start by saying that I do have knowledge with respect to the manner in which the McCreary bill is computed, and it is that a charge is made to McCreary relative to the charge which is made to Firestone, that relation being pro rata, based upon their volume of production." (Transcript, pages 22,668–22,669) ; see also Transcript, page 22,674.) [8]

(v) On September 29, 1965, there was produced by Mr. Irons and admitted into evidence as DX 1836 a transcription of secretarial notes of a telephone conference with McCreary on March 30, 1961. The following is attributed to Mr. Irons:

"Mr. McCreary, the thinking in this direction is that as far as the cost of the litigation is concerned with this office that you would be billed for it, but suppose there is a decision which is adverse. I don't know whether Mr. Beckett covered this with you or not but to the extent that you purchased your oil extended rubber from Fire-

---

7. In McCreary's Reply to "Intervener Firestone's Opposition to Petition of McCreary for Leave to File Additional Material", filed in the Clerk's Office of the United States Court of Appeals for the Fourth Circuit on or about May 13, 1966, Mr. Walter J. Blenko, Jr., as attorney for McCreary, after referring to the dictaphone belt and the discussion of the fees to be charged McCreary by Mr. Irons' firm, says:

" * * * In all prior testimony known to McCreary and its present counsel, Mr. Clark denied the existence of any agreement between Firestone and McCreary relating to participation in the action or 'as to any payment' (Trial Transcript, page 18,933)."

No reference is made to the last paragraph quoted above, or to the fact that it was a *continued* answer." This "continued answer" clearly discloses that there *was* an understanding with McCreary as to payment of the litigation expenses.

This partial quotation, without reference to the balance of Mr. Clark's answer, is shocking to this Court. Whether it was fraud or attempted fraud upon, or contempt of, the Court of Appeals, is of course not for this Court to decide.

8. Birch was clearly in error as to dates and place of discussion with McCreary; see Transcript 22,673–22,674; 33,348–33,349.

stone, of course Firestone would have to pay on that anyway, but you are not looking for Firestone to hold you harmless in that event with respect to rubber you purchased from them." [9]

(vi) In its oral opinion of December 13, 1965, on the October 12, 1965 superseding motion, the Court had had before it all of the foregoing, and referred to the "at least partial sharing of costs by McCreary * * *" (Transcript, page 26,994).

(vii) On April 26, 1966, before the Court had read the transcript of the dictaphone recording of May 9, 1961, or had heard the belt played, it stated:

"Well, Mr. Birch specifically testified as to the existence of an agreement, and that the agreement was that a charge is made to McCreary relative to the charge which is made to Firestone, that relation being pro rata, based upon their volume of production.

"That is clearly and flatly in the record, pages 22,668 to 22,669.

"I do not believe there has ever been any contention that there was not an agreement between Firestone and McCreary. There may be differences of opinion as to what the true arrangements are, but the testimony of Mr. Birch is flatly to the existence of an agreement, and as to the general nature of its terms."

(viii) On April 26, 1966, the dictaphone record of May 9, 1961 was played and transcribed (Transcript, pages 33,-325–33,330). In it, Birch [10] states that General is "probably trying to line up to say in the long run that McCreary can be transferred out because they are just Firestone's little patsy, and Firestone is paying the whole bill." Then the suggestion is made that "with full recognition that the agreement that was made between you and Stanley Clark is not going to, in the long run, change one little

bit", that as the relative production between McCreary and Firestone was about 99 to 1, McCreary being one per cent of Firestone's total tire business, "we" would like "to formally bill you folks for one per cent of the cost of this litigation * * *" which would be done monthly, and to be paid to the Irons firm just as if "Firestone didn't even exist," bearing in mind that "after this is all over with, why, everything will come out in the wash." Birch said he did not want "to leave any stone unturned in case" General "should file an interrogatory and ask McCreary if they are paying their toll in this law suit"; so a bill would be sent for both March and April.

Birch further said that he didn't want "to put anything in the mail, and I don't want to talk about it too much, for obvious reasons."

At the conclusion of the playing of the dictaphone belt, the Court indicated (Transcript, pages 33,332–33,333) that the only matters justifying further interrogation were as to whether Birch intended to refer to a dollar amount per month, or one per cent a month; and what was meant by the agreement with Clark. However, no restrictions were placed on the interrogation of Birch or Clark.

On oral examination Birch testified that he called McCreary at Irons' request and told him "[T]hose things you just heard on the tape"; that he was not aware of an agreement between Clark and McCreary "relating to the case" but he "was aware of an agreement between Mr. Clark and Mr. McCreary that had to do with the payment of fees charged by our firm in a particular circumstance" (Transcript, page 33,338); that the only agreement he knew of was that Firestone would pay for the trip he took to Indiana, Pennsylvania, "[E]xcept for the one on

9. Defendant suggests that the memorandum should read that "as far as the cost of the litigation is concerned with this office that you would not be billed for it." As indicated above and below, the memorandum would appear to be, and the Court finds it to be, accurate as written.

10. That "Voice Number 3" was that of Mr. Birch is conceded.

the tape"; (Transcript, page 33,339); that he didn't want to put anything in the mail or talk too much since his firm's fees and their arrangement were their business only; that if Firestone won the case, he had no understanding that fees paid by McCreary would be returned to it (Transcript, page 33,340); that "win, lose or draw, McCreary was to pay, once and for all, one per cent, and that it was regardless of the outcome"[11]; that he could not recall what was meant about coming out in the wash, but thought it meant "that whether it is paid as a percentage or in a lump sum or now or next week or next year, the result will be the same"; that "formally" meant a written bill; and that while generally aware of his firm's representation of McCreary, Birch had not been intimately connected with it. (Transcript, pages 33,365–33,-366.)

That same afternoon Clark (who was out of the court room during Birch's examination) was called and testified that other than that he would have thought that he rather than Irons had told McCreary that McCreary would not be held harmless, he saw nothing that struck him as incorrect in DX 1836; as to the reference to the agreement between Clark and McCreary, mentioned on the tape, he said:

"I think that probably the agreement I had was not to have an agreement. What I thought our understanding with McCreary was was this, that we were both free agents, that Firestone was *going to finance this litigation*, I had the impression that McCreary would carry its share of the burden, small though that may be; that there was no obligation upon McCreary for example not to settle, McCreary always had the freedom to settle any time they pleased, for example; I also thought and still think that there was no obligation on our part to save McCreary harmless.

"I think it summed up to this point, that McCreary was going to pay its share, but a very small share of the litigation, that we would of course necessarily by our size and by our determination to go ahead essentially finance it. Beyond that, there was nothing." (Transcript, page 33,399.)

that he assumed that the reason for Birch's call on May 9, 1961 was to tell McCreary what the ratio of payments was going to be; that there was no other agreement as to what would happen after the case was over, although he thought that "we would be reimbursed by an order of this Court for costs and attorneys' fees"[12] (Transcript, page 33,-400); that there was no agreement with McCreary prior to May 9, 1961 that Firestone would pay all the legal bills; when again interrogated[13] as to the agreement, he said:

"The only contact I had with Mr. McCreary after we had decided to sue is embodied in this memorandum. It was that telephone call which Mr. Irons and I made to Mr. McCreary on the morning prior—on the morning I guess of the day we filed the suit, and I don't recall ever having a conversation with Mr. McCreary again, certainly not on this subject at all.

"My understanding of the arrangement, if you want to call it that, whatever name you want to put to it is that McCreary was a free agent, free to settle, we did not hold McCreary harmless, McCreary came in at their own risk, and that we were certainly going to pay practically all of the expenses but that McCreary was going to carry a pro-rata burden. That's been my understanding of the arrangement from the very beginning." (Transcript, page 33,409.)

The court then inquired of counsel what they desired the Court to do, stating that "if it is a ruling as to whether the tape is inconsistent with Mr. Birch's

---

11. The language was embodied in a question by the Court, answered in the affirmative.

12. The "wash out" testimony of Birch.

13. By Mr. Blenko, Jr.

testimony, I would say that my present rather strong impression is that there is no substantial inconsistency between his testimony in court and the tape." (Transcript, page 33,417).

It has been asserted by counsel for Firestone, without contradiction,[14] that during the litigation McCreary has regularly been billed for, and paid, a portion of the legal expenses.

The Court finds as a fact that from March 30, 1961 McCreary was aware that it would be billed for part of the litigation costs; that in fact it has been billed for one per cent thereof; that this was a bona fide arrangement, with no agreement that in fact, ultimately, Firestone would bear all the costs or repay to McCreary any payment made by McCreary; and that this arrangement, understood by this Court on December 13, 1965, is consistent with the dictaphone recording of the telephone conversation on May 9, 1961, offered in court on April 26, 1966.

(d) The "secret" agreement.

As previously indicated, the terms of the alleged secret agreement between Firestone and McCreary have not been developed, and no proffer with respect thereto has been made. The court's finding must therefore necessarily be negative in nature. It is that there is no evidence legally sufficient to prove, or even to justify an inference as to, the existence of a secret or undisclosed agreement between Firestone and McCreary as to the conduct of this litigation, or the payment of the expenses thereof.

3. *Representations as to the effect of the joinder of McCreary.*

There appears to be at least an implication [15] that this court was misled into the belief that the joinder of McCreary might prevent transfer to Cleveland. In fact, plaintiffs' counsel at the July 6, 1961 hearing stated flatly that he did not so contend; that transfer was possible. The court was fully aware of this throughout the case, as indicated in its oral opinion of December 13, 1965 (Transcript, page 26,994).

It has been suggested that the fact that McCreary was an independent party prosecuting the case at its own expense may well have been a determinative factor in the denial of the first motion by defendant to transfer, that is defendant's motion of April 13, 1961 to dismiss or transfer, although the record is clear that the court was fully aware that McCreary's joinder did not prevent transfer (as indicated above) and although the court was fully aware that had Firestone desired to gain a technical advantage, suit could have been brought solely by McCreary with a silent, subsurface undertaking by Firestone completely to indemnify and save harmless McCreary.[16] That the court did not consider the fact that McCreary was an independent party prosecuting this case at its own expense a factor, much less a determinative factor, militating against transfer is evidenced by the court's oral opinion of July 6, 1961 denying the first transfer motion and its memorandum of October 14, 1963, denying the second transfer motion, in neither of which is the independence of McCreary, or the sharing of

14. Mr. Blenko, Jr., as counsel for McCreary, certainly had access to McCreary's accounting records, and could easily have refuted the claim if untrue.

15. Defendant's Exhibit D to Memorandum in Support of Renewed Motion.

16. "When the suit was filed, McCreary was a bona fide customer of Firestone as to oil-extended rubber for tread stock and camelback. As such, Firestone could have solicited McCreary to bring the suit as sole plaintiff on an undertaking by

Firestone completely to indemnify and save McCreary harmless. A fortiori, the open participation by Firestone and at least partial sharing of costs by McCreary is not improper. See Wheeler v. [City and County of] Denver, 1913, 229 U.S. 342 [33 S.Ct. 842, 57 L.Ed. 1219] and see also Schnell v. [Peter] Eckrich & Sons, 1961, 365 U.S. 260 [81 S.Ct. 557, 5 L.Ed.2d 546]." (Oral opinion of December 13, 1965; Transcript, pages 26,993–26,994.)

expenses, relied upon as a reason for the denials.

While the court has endeavored to cover the major points, the above memorandum does not purport to be exhaustive. The Court has however carefully considered all the memoranda and exhibits filed by the parties, all transcript references and exhibits to which reference has been made, and the transcript of the oral arguments of counsel, upon the whole of which it makes the following general and ultimate

## Findings of Fact

 1. McCreary was an independent party throughout the entire period herein involved and still is an independent party.

2. McCreary agreed to and in fact did bear its proportionate share of the cost of litigation.

3. There is no evidence legally sufficient to prove, or even to justify an inference as to, the existence of a secret or undisclosed agreement between Firestone and McCreary as to the conduct of this litigation, or the payment of the expense thereof.

4. The fact that McCreary was an independent party prosecuting the case at its own expense, proportionally, was not a factor, much less a determinative factor, in the denial of the defendant's motion of April 13, 1961 to dismiss or transfer.[17]

5. No fraud, serious or otherwise, has been practiced upon the Court by the plaintiffs.

6. There has been no effort by plaintiffs to practice fraud upon the Court.

## Conclusions of Law

1. No fraud has been practiced upon the Court by the plaintiffs.

2. There has been no effort by plaintiffs to practice fraud upon the Court.

3. The renewed motions of April 13, 1961 to dismiss or transfer, of September 6, 1963 to transfer, and the motion for the imposition of sanctions, are each and all without merit, and should be and are denied.

---

17. It is probable that if fraud were in fact intended, it would be immaterial whether or not the court had actually been misled. Hazel-Atlas Glass Co. v. Hartford-Empire Co., 1944, 322 U.S. 238, 247, 64 S.Ct. 997, 88 L.Ed. 1250; Keystone Driller Co. v. General Excavator Corp., 1933, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293.

However, because of the language of the Court of Appeals that the alleged false representations "may well have been the determining factor in the denial of the transfer motion" (363 F.2d at page 89) this Court thought it advisable to make Finding 4.